IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

NICHOLAS MANCUSO,

                Plaintiff,                        CV-07-835-ST

      v.                                      OPINION

AMERICAN FAMILY MUTUAL INSURANCE
COMPANY, a Wisconsin Based Insurance
Company,

                Defendant.

STEWART, Magistrate Judge:

## **INTRODUCTION**

Plaintiff, Nicholas Mancuso ("Mancuso"), brings this action to recover insurance

payments from defendant, American Family Mutual Insurance Company ("AMCO"), for the

value of the contents of his storage unit which was destroyed in a fire.  The First Amended

Complaint alleges five claims:  Breach of Contract (First Claim); Attorney's Fees pursuant to

ORS 742.061 (Second Claim);  Outrageous Conduct (Third Claim); Intentional Infliction of

Emotional Distress ("IIED") (Fourth Claim); and Defamation *Per Se* (Fifth Claim).  This action was originally filed in Multnomah County Circuit Court as *Mancuso v. Am. Fam. Mut. Ins. Co.*, Civil No. 0705-05254, and removed to this court pursuant to 28 USC §§ 1332 and 1441.  All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c).

AMCO has moved for partial summary judgment on the Third, Fourth and Fifth Claims. That motion was granted by Order dated January 5, 2009 (docket #66).  This Opinion explains the basis for that Order.

## STANDARDS

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law."  The moving party must show an absence of an issue of material fact.  *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986).  Once the moving party does so, the nonmoving party must "go beyond the pleadings" and designate specific facts showing a "genuine issue for trial."  *Id* at 324, citing FRCP 56(e).  The court must "not weigh the evidence or determine the truth of the matter, but only [determine] whether there is a genuine issue for trial."  *Balint v. Carson City, Nev.*, 180 F3d 1047, 1054 (9th Cir 1999) (citation omitted).  A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact.  *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F2d 626, 630 (9th Cir 1987).  The

court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party." *Id* (citation omitted).

## UNDISPUTED FACTS

On May 11, 2005, a fire destroyed Mancuso's storage unit and its contents at a Shurgard Storage facility in Tigard, Oregon. Vangelisti Decl., Ex. 1, AF 0146. The unit was 10'x 20' and shared with another person. Clark Decl., Ex. 1. Mancuso had an insurance policy issued by AMCO that provided partial coverage of the personal property contained in the storage unit. The policy also listed Mancuso's ex-wife, Malina McLean ("McLean"), as an insured. Mancuso filed an insurance claim to recover the value of his property. When the insurance adjustor initially asked Mancuso for an estimate of the damage on May 12, 2005, Mancuso took a "wild shot in the dark" and told him somewhere between $25,000 and $50,000. Vangelisti Decl., Ex. 1, AF 1264; Clark Decl., Ex. 3 (August 7, 1006 Examination Under Oath of Nicholas Mancuso), p. 105.

On November 4, 2005, an AMCO employee made an internal report that Mancuso was still filling out the contents form and sent a letter to Mancuso reminding him that he had one year from the date of loss to recover under the policy. Vangelisti Decl., Ex. 1, AF 0148. On November 14, 2005, AMCO closed Mancuso's claim file for administrative purposes since six months had passed and Mancuso had still not submitted a list of contents. *Id* at AF 0147. AMCO did not notify Mancuso of this decision, but did note that it would "reopen claim and handle as warranted" if Mancuso presented the contents form. *Id*.

Approximately one year after the fire, Mancuso submitted a list of the items he claimed were contained in the storage unit. *Id* at AF 1263. The list was more than 500 pages long with

over 10,000 items and indicated a total property loss of over $750,000. *Id;* Clark Decl., Ex. 4. Mancuso's policy limit was $143,800. Vangelisti Decl., Ex. 1, AF 0146. Upon receipt of the list, AMCO concluded that Mancuso had engaged in concealment or fraud. *Id*, Ex. 2 (Olson Depo.), p. 35. It referred Mancuso's claim to its special investigations unit ("SIU"), where the claim was handled by Alex Boras ("Boras"). *Id*, Ex. 1, AF 0296.

Boras conducted an investigation which included interviewing Mancuso's ex-wife. She recalls that Boras "talked about the fact that Nick was claiming a pretty excessive amount" and told her that "he felt [the claim] wasn't legitimate or possibly could be fraudulent." *Id*, Ex. 3 (McLean Depo.), p. 112. When asked if she remembered specific items claimed by Mancuso, she "gave him 'yeas' or 'nays' on a couple of bigger items." *Id* at 113.

On June 26, 2006, an AMCO representative spoke with Mancuso who "became irate and stated that he wants to move the claim along since [AMCO] [had] taken 14 months doing the investigation." Vangelisti Decl., Ex. 1, AF 1257. Mancuso agreed to meet with the representative and fill out a Sworn Statement in Proof of Loss form and Information and Access Authorization form, though he wondered why he had to fill out more forms. *Id*. Mancuso completed both. *Id* at AF 0289-99.

On October 12, 2006, AMCO decided to deny Mancuso's claim and internally took the position that every item on the contents form was fraudulent. Olson Depo., pp. 142, 179. AMCO then transmitted the contents form to another agent to determine what items really were in the storage unit and make an economic decision about whether to make an offer to Mancuso. *Id* at 142, 155; Vangelisti Decl., Ex. 1, AF 0001. In January 2007, while this investigation was ongoing, AMCO's attorney sent Mancuso the following letter:

> This letter is to follow up in connection with [your] claim.  The [AMCO] claims office is still in the process of reviewing your very extensive contents list.  As soon as [AMCO] has completed its analysis, I will be in contact with you to see if we can try and settle this claim.
>
> [AMCO] reserves any and all contractual rights and defenses that may now exist, or that may arise in the future.  No waiver or estoppel of any kind is intended nor should any be implied by this letter or [AMCO's] decision to make a settlement offer.

*Id* at AF 0706.

By letter dated February 12, 2007, AMCO offered to pay Mancuso $33,318.98 to resolve his claim, while fully reserving any rights and defenses it might have, and gave him until noon, February 19, 2007, to accept the offer.  Clark Decl., Ex. 5.  He did not respond.

By letter dated March 16, 2007, AMCO informed Mancuso that it had decided to deny his claim:

> Your personal contents claim with American Family Insurance Company referred to above is denied.  Your insurance policy contains the following provision:
>
> **GENERAL CONDITIONS**
>
> **3. Concealment or Fraud.**
>
> a.  This entire policy is void if, before or after a loss, any **insured** has:
>
>> 1.  intentionally concealed or misrepresented any material fact or circumstance;
>> 2.  engaged in fraudulent conduct; or
>> 3.  made false statements;
>> relating to insurance.
>
> Our investigation indicates that you have breached the terms and conditions of the contract of insurance as stated above relating to the subject claim of May 11, 2005.  Because of such breaches American Family must deny your claim and your policy is void as of 12:01 a.m. on May 11, 2005.
> . . .

> You have two years from the date of loss within which to
> commence suit on the claim presented under your auto policy.

Vangelisti Decl., Ex. 1, pp. AF 1268-69.

Mancuso claims that this was the first he heard that AMCO suspected his claim was

fraudulent or considered denying his claim.  Mancuso Decl., ¶ 2.

## DISCUSSION

I.    **IIED and Outrageous Conduct Claims (Third and Fourth Claims)**

A.    **Legal Standards**

At the outset, both parties agree that Oregon does not recognize IIED and Outrageous

Conduct as separate torts.  *See Lewis v. Oregon Beauty Supply Co.*, 302 Or 616, 626, 733 P2d

430, 436 (1987) ("Plaintiff's so-called 'Outrageous Conduct' claim is actually a claim for

intentional infliction of severe emotional distress."); *see also Hendgen v. Forest Grove Cmty.*

*Hosp.*, 109 Or App 177, 179 n1, 818 P2d 966, 967 (1991) (quoting *Lewis*).  Accordingly, the

court will treat the Third and Fourth claims as one IIED claim.

To prove an IIED claim, Oregon law requires the plaintiff to prove three elements:

> (1) that [the] defendant[] intended to cause plaintiff severe emotional
> distress or knew with substantial certainty that their conduct would cause
> such distress; (2) that [the] defendant[] engaged in outrageous conduct-
> *i.e.*, conduct extraordinarily beyond the bounds of socially tolerable
> behavior; and (3) that [the] defendant['s] conduct in fact caused plaintiff
> severe emotional distress.

*Checkley v. Boyd*, 198 Or App 110, 124, 107 P3d 651, 660 (2005), citing *McGanty v.*

*Staudenraus*, 321 Or 532, 543-50, 901 P2d 841, 849-52 (1995).

AMCO primarily argues that in order for a valid IIED claim to exist, Oregon law also

requires a special relationship between an insurer and its insured.  *See Georgetown Realty, Inc. v.*

6 - OPINION

*The Home Ins. Co.*, 313 Or 97, 831 P2d 7 (1992); *Strader v. Grange Mut. Ins. Co.*, 179 Or App

329, 39 P3d 903 (2002).  That argument is largely inapposite to the situation here.  While

Oregon courts have found that "a special relationship between the parties has played a role in

every case in this state involving a successful claim of IIED" and that "the lack of such a

relationship generally defeats a conclusion that the conduct is actionable through an IIED claim,"

no case requires such a special relationship.  *Delaney v. Clifton*, 180 Or App 119, 130-31, 41 P3d

1099, 1106-07 (2002) (quotations, brackets, and citations omitted) (citing cases).  Rather, a

special relationship is but one factor, albeit a very weighty one, that courts may consider when

determining whether the conduct at issue is extreme and outrageous.  *See id* at 130, 41 P3d at

1106 (listing factors).  In any event, this court need not address the existence or import of any

special relationship here because Mancuso has failed to show any evidence of outrageous

conduct by AMCO.

At the core of every IIED claim is the requirement that the behavior engaged in be

"outrageous in the extreme."  *Watte v. Edgar Maeyens, Jr., M.D., P.C.*, 112 Or App 234, 239,

828 P2d 479, 481 (1992).  It is axiomatic that "[c]onduct that is merely rude, boorish, tyrannical,

churlish and mean does not satisfy that standard, nor do insults, harsh or intimidating words, or

rude behavior ordinarily result in liability even when intended to cause distress."  *Id* (internal

citations, quotations, and ellipses omitted); *see also*, *Christofferson v. Church of Scientology of*

*Portland*, 57 Or App 203, 212-13, 644 P2d 577, 585 (1982) ("It is only by proof of conduct that

is 'beyond the limits of social toleration' that plaintiff may recover in an action for outrageous

conduct, no matter what defendants may have intended and no matter what the effect on plaintiff

may have been."), *review denied*, 293 Or 456 (1982), *cert denied*, 459 US 1206, 1227 (1983).

Whether conduct is outrageous in the extreme "is a fact specific inquiry" to be analyzed "on a case-by-case basis, considering the totality of the circumstances involved, to determine whether it constitutes an extraordinary transgression of the bounds of socially tolerable conduct." *Buckel v. Nunn*, 133 Or App 399, 404, 891 P2d 16, 20 (1995) (citation and internal quotations omitted). However, initially "[i]t is a question of law whether, viewing the evidence in the light most favorable to plaintiff, defendants' conduct constitutes 'extraordinary conduct which a reasonable jury could find beyond the farthest reaches of socially tolerable behavior.'" *Tenold v. Weyerhaeuser Co.*, 127 Or App 511, 517, 873 P2d 413, 417 (1994), *review dismissed*, 321 Or 561, 901 P2d 859 (1995), quoting *Hall v. The May Dep't Stores*, 292 Or 131, 137, 637 P2d 126, 130 (1981), *overruling on other grounds recognized by Patrick ex rel. Estate of Patrick v. State*, 178 Or App 97, 36 P3d 976 (2001).

**B.    Analysis**

Mancuso relies on the following facts to prove outrageous conduct by AMCO:

(1) AMCO deceived him by representing to him that his claim was in the adjustment process when AMCO actually was investigating him for possible fraud;

(2) AMCO defamed him to his ex-wife when its SIU agent told her that his claim seemed "pretty excessive" and used the word "fraud" in speaking with her about his claim;

(3) AMCO denied his claim without notice and accused him of concealment or fraud.

None of these facts, alone or in the aggregate, constitute "extraordinary conduct which a reasonable jury could find beyond the farthest reaches of socially tolerable behavior." *Id*. Rather, these facts show that AMCO engaged in an ordinary investigation of an extraordinary insurance claim.

It is not surprising, or outrageous, that AMCO waited until it had completed its investigation before informing Mancuso of its conclusion that he had violated the terms of the policy through fraud or concealment.  Also, even if some of the words spoken by AMCO's investigator to Mancuso's ex-wife may have been unnecessary, as Mancuso claims, they were not outrageous.  Finally, no evidence shows that AMCO's delay in notifying Mancuso of its decision caused Mancuso any prejudice.  Despite the fact that AMCO had taken the "internal position" by October 2006 that the claim was fraudulent and should be denied, it was still investigating the validity of the claim in some capacity as late as December 2006.  Vangelisti Decl, Ex. 1, AF 0001.  In any event, AMCO notified him of its denial two months before the statute of limitations ran.  Furthermore, Mancuso has submitted no evidence that he would have accepted the February 2007 settlement offer had he known his claim would otherwise be denied.

Even accepting Mancuso's characterization of AMCO's conduct as deceit, not all deceit rises to the level of outrageous conduct.  For example, in *Pittman v. Travelers Indemn. Co.*, 2006 WL 1643655, *7 (D Or June 7, 2006), this court held that an insurance company had not committed outrageous conduct where its agents lied about the existence of evidence with the "nefarious purpose of putting financial pressure on [the plaintiff] to accept a lowball settlement offer."  While not excusing the intentional concealment of evidence, the conduct at issue did not fall beyond the bounds of socially tolerable conduct.

In contrast, in *Fletcher v. W. Nat'l Life Ins. Co.*, 10 Cal App3d 376, 89 Cal Rptr 78 (1970), the insurance company stopped making disability payments to the insured on his valid workers' compensation claim after falsely asserting it had conducted an extensive investigation revealing that the insured's condition was due to a pre-existing congenital condition of which he

had improperly failed to notify the insurer.  The insurance company offered to settle his claim by allowing him to keep the benefits already received in exchange for cancellation of the policy and an execution of a full release.  The court described the insurer's conduct as a "malicious and bad faith refusal to pay plaintiff's legitimate claim."  *Id* at 392, 89 Cal Rptr at 87.  The Oregon Supreme Court later cited *Fletcher* as "a typical case of outrageous conduct" in which the insurance company used an "intentional program of harassment" in order to get its insured "in such an upset and emotional state of mind that he would readily settle the company's remaining liability."  *Farris v. U.S. Fid. & Guar. Co.*, 284 Or 453, 463, 587 P2d 1015, 1021 (1978).

Other examples where courts have found deceitful conduct by the insurance company to constitute outrageous conduct include *Green v. State Farm Fire and Cas. Co.*, 667 F2d 22 (9th Cir 1982), and *Unruh v. Truck Ins. Exch.*, 7 Cal3d 616, 498 P2d 1063 (1972), superceded by statute on other grounds as stated in *Siva v. Gen. Tire & Rubber Co.*, 146 Cal App3d 152, 194 Cal Rptr 51 (1983).  In *Green*, the court affirmed a jury award for outrageous conduct where the insurer's agent:  induced the plaintiff to make a sworn statement by telling him that the information would be used in confidence, but then delivered it to the police in connection with a criminal investigation into the fire that burned down his barn; posed as a police officer and questioned his neighbors even though it knew police had abandoned the criminal investigation; and threatened to have him charged with arson if he continued to pursue his claim, even though it knew no such charge could be made.  In *Unruh*, the court held that plaintiff had sufficiently stated an IIED claim where the insurer's agent misrepresented his identity to the claimant, induced her to become emotionally involved with him, and then enticed her to conduct herself in

a manner beyond her normal physical capabilities while another agent filmed her, all in an effort to show her claim was without merit.

In the same vein is *Stafford v. Westchester Fire Ins. Co. of N.Y., Inc.*, 526 P2d 37, 39 (Alaska 1974), where the plaintiff alleged that a workers' compensation insurer had committed tortious conduct when its agents wilfully, deliberately, and maliciously withheld benefits in an effort to discourage him from obtaining workers' compensation benefits. The court did not explicitly address whether this conduct was outrageous, but instead, adopting the reasoning in *Unruh*, decided that a workers' compensation insurer lost its statutory immunity from suit where it engaged in malicious and intentional conduct in the course of the investigation and payment of a claim. Because the court remanded the case for trial on the merits, it implicitly concluded that the conduct was sufficiently outrageous.

In contrast to these cases, Boras did not misrepresent his identity in the course of his investigation or threaten Mancuso with criminal liability if he chose to pursue his claim. AMCO did not, through deceit, induce Mancuso to take any actions which prejudiced his otherwise valid claim or attempt, through excessive delay or harassment, to get him in such an emotional state that he would readily settle his otherwise meritorious claim. Instead, the facts show that AMCO decided his claim was fraudulent almost immediately upon receipt of his property inventory showing losses 15 times greater than his initial estimate to their agent. It then conducted an investigation, decided it would deny the claim, continued its investigation, offered a settlement through its attorney, then denied his claim after Mancuso chose not to accept the settlement. All of this occurred in a span of eight months. While accusing an insured of fraud and concealment

is a serious charge, there is no evidence that AMCO has taken this position in anything but good

faith or with the intent to coerce Mancuso to compromise or abandon his claim.

The facts here are not nearly as extreme as the conduct at issue in *Fletcher, Unruh*,

*Green*, or *Stafford*.  They are even less egregious than those found insufficient in *Pittman*.

Because Mancuso has failed to present sufficient evidence of outrageous conduct by AMCO, his

IIED claim fails.  As a result, the Third and Fourth Claims are dismissed.

**II.    Defamation *Per Se* Claim (Fifth Claim)**

**A.    Legal Standards**

The Fifth Claim alleges that AMCO defamed Mancuso by falsely stating that he had

committed insurance fraud and a crime.  This is premised on Boras' statements to McLean using

the word "fraud" and referring to Mancuso claiming a "pretty excessive" amount.

"A defamatory communication is one that would subject another to '. . . hatred, contempt

or ridicule . . . [or] tend to diminish the esteem, respect, goodwill or confidence in which [the

other] is held or to excite adverse, derogatory or unpleasant feelings or opinions against [the

other].'"  *Reesman v. Highfill*, 327 Or 597, 603, 965 P2d 1030, 1034 (1998), quoting *King v.

Menolascino*, 276 Or 501, 504, 555 P2d 442, 443 (1976) (alterations in original).  "To be

actionable, a communication must be both false and defamatory."  *Id* at 604, 965 P2d at 1034.

"The court, rather than the jury, determines whether a communication is capable of a defamatory

meaning."  *Id*, citing *King*, 276 Or at 504, 55 P2d at 443.  "In making that determination, the

court looks to the context in which the communication was made."  *Id*.  "Even a communication

that is not defamatory on its face may be defamatory if a reasonable person could draw a

defamatory inference from the communication."  *Id*.

In addition, "[s]poken words are actionable *per se* in Oregon only if they are words tending to injure the plaintiff in his or her profession or business, or if they impute to plaintiff the commission of a crime involving moral turpitude." *Id* at 95, 333 P3d at 155, citing *Davis v. Sladden*, 17 Or 259, 261, 21 P 140, 141 (1889). A claim of defamation *per se* relieves the plaintiff from the burden of pleading and proving special damages. *Marleau v. Truck Ins. Exch.*, 333 Or 82, 94, 37 P3d 148, 155 (2001).

B.    <u>Analysis</u>

At her deposition, McLean testified as follows about her conversation with Boras:

> Q:  Do you remember what they said or what they asked?  Do have any recollection of what was said?
> A:  I wasn't at home when the gentleman showed up, but I do remember him asking me if we were still married or separated; that kind of information.
> Q:  Anything else you can remember?
> A:  I remember him stating my name was still on the policy, which was kind of a shock to me.
> Q:  Did he talk about the claim at all?  Do you remember that?
> A:  He talked about the fact that Nick was claiming a pretty excessive amount.
> Q:  Is that the words he use [*sic*]?
> A:  Of course, it wasn't the same amount as what was stated here today.
> . . . .
> Q:  Did he give his opinion about the legitimacy of Nick's claim or anything like that?
> A:  He gave his opinion about – yeah, I guess he did that.  Possibly he felt it wasn't legitimate or possibly could be fraudulent, yes.
> Q:  Did he use those words, do you remember?
> A:  Yeah, he had concerns regarding the legitimacy from the get-go because of the amount of items.
> Q:  Do you remember him using the word "fraud" or "fraudulent?"
> A:  I believe he would have used the word "fraud," yeah.
> Q:  Your best recollection?
> A:  Yeah.

McLean Depo., pp. 111-13.

AMCO's attorney later sought clarification as follows:

> Q:  So as you sit here today, you are 100 percent certain that Mr. Boras used the word "fraud" in that conversation two years ago?
> A:  Yes.  He had concerns surrounding it from the get-go.
> Q:  And I appreciate that, and I think at one point you said he had concerns regarding the legitimacy of the claim because of the volume of the property claimed.  The question I have is whether you have specific recollection that Mr. Boras used the word "fraud" in that conversation two years ago?
> A:  I believe that he at least used it once, yes.

*Id* at 116-17.

By using the word "fraud" at some point in the conversation and by stating that Mancuso was claiming a "pretty excessive" amount, Mancuso argues that Boras was accusing him of committing the crime of theft by deception under ORS 164.085, which provides, in pertinent part:

> (1) A person, who obtains property of another thereby, commits theft by deception when, with intent to defraud, the person:
>
>> (a) Creates or confirms another's false impression of law, value, intention or other state of mind that the actor does not believe to be true;
>>
>> (b) Fails to correct a false impression that the person previously created or confirmed;
>>
>> (c) Prevents another from acquiring information pertinent to the disposition of the property involved;

This court disagrees.  The comments by Boras, as related by McLean, do not accuse Mancuso of committing any crime.  McLean did not testify that Boras in fact accused Mancuso of fraud, but only that he used the word "fraud."  He used this word in the context of giving his opinion that Mancuso's claim "possibly could be fraudulent."  It is not surprising that he would use such a term with McLean because he was, in fact, investigating whether Mancuso's claim

14 - OPINION

was fraudulent.  While his statement could imply that he thought Mancuso had committed a crime or submitted a fraudulent claim, it does not accuse him of doing so.  A vague and unclarified reference to "fraud" is insufficient evidence in this context to show that Boras was accusing Mancuso of committing theft by deception or any other crime.

Boras' statement that Mancuso "was claiming a pretty excessive amount" is, again, not accusing him of a crime, but, either is a non-defamatory opinion or the truth.  McLean's testimony is unclear whether Boras actually used these words or if this was her understanding of their conversation.  Even if he did use these words, stating that an insured is claiming an excessive amount on an insurance policy does not accuse him of a crime, but instead is a reflection of the speaker's opinion about the amount of the claim.  Excessive is a relative term implying some comparison to the normal or usual.  *See* WEBSTER'S THIRD NEW INT'L DICT. 792 (1981) (defining "excessive" in part as "exceeding the usual, proper, or normal" or "greater than usual").  Asserting that a claim is excessive, therefore, does not necessarily imply that the claim is fraudulent.  Rather, such a statement merely compares the amount of claim at issue to some hypothetical usual, proper, or normal amount in the mind of the speaker and reveals the speaker's opinion that the amount claimed does not fall within that range. When considered in the context of the conversation as related by McLean, no permissible inference can be drawn that Boras was accusing Mancuso of a crime by asserting that his claim was excessive.  Rather, in the context of the rest of the conversation, the only permissible inference is that he was informing McLean of the purpose of his investigation or his own suspicion.

Mancuso argues that Boras' comments were unnecessary since he only needed to tell McLean that he was investigating Mancuso's claim and would like her to verify certain items on

the property list.  This argument is not persuasive.  First, by seeking out confirmation of a claim from persons other than the insured, an insurance company indicates that it does not wholly accept the insured's statement of his loss.  A reasonable person could infer that the insurer believes the insured may not be wholly truthful, and, thus, may have committed fraud.  Second, a reasonable person would likely inquire as to the purpose of any investigation by an insurance company, leaving the insurance company the options of lying or admitting its purpose.  This problem is compounded when the insurance company is actually investigating fraud.  It would need to either conduct the investigation without revealing its purpose, and then face possible charges of misrepresentation as the basis for an IIED claim, or admit its purpose, necessarily revealing its suspicion and implying that the insured had committed a crime, and then face a possible claim for defamation.  Where, as here, the insurer does not affirmatively accuse the insured of a crime during the course of its investigation, or assert facts that could be interpreted as accusing him of a crime, but instead expresses an opinion as to the validity of the insured's claim in the course of conducting its investigation, no defamation *per se* occurs.

The entire conversation, as related by McLean, shows that Boras was not imputing criminal conduct to Mancuso, but explaining why he was questioning her, namely, because she was listed on the policy as an insured and he had concerns that the claim submitted could possibly be fraudulent and was excessive.  He was not attempting to paint Mancuso in a bad light or engaging in vicarious harassment.  His conduct, in all likelihood, was beneficial to Mancuso by placing McLean on notice that her answers could have a significant impact on the determination of his claim.  McLean's testimony shows that Boras was forthright in explaining the purpose of his questioning her and did not accuse Mancuso of a crime, but simply let

McLean know "from the get-go" that he had "concerns" about the legitimacy of Mancuso's claim.

As support, Mancuso cites *Muresan v. Phila. Romanian Pentecostal Church*, 154 Or App 465, 962 P2d 711 (1998), where the court held that the plaintiffs had sufficiently proven defamation *per se.* The evidence showed that the pastor of the plaintiffs' church had, on multiple occasions, accused them of taking their children to doctors and faking their injuries in order to get money from another family in the church whose daughter had caused an automobile accident with the plaintiffs' children. The pastor "acknowledged that accusing plaintiffs of defrauding . . . the insurance company would amount to accusing them of a crime," but disagreed that his words amounted to such. *Id* at 473, 962 P3d at 715-16 (citing ORS 164.085). The court disagreed. It did not matter that the pastor had not "given plaintiffs' conduct the name of a particular crime" because "he did accuse them falsely of having committed a crime." *Id* at 474, 962 P2d at 716.

The comments made by Boras are not as explicit as those in *Muresan. See Reesman*, 327 Or at 604, 965 P2d at 1034 ("the link between the communication and the defamatory inference must not be too tenuous") (internal quotation, citation omitted). In *Muresan*, the pastor explicitly accused the plaintiffs of committing a crime by repeatedly telling other parishioners that they had their children fake injuries to bilk more money out of another church family and its insurance company. In contrast here, Boras did not affirmatively accuse Mancuso of committing fraud. Rather, in the context of conducting an investigation, Boras expressed to McLean his own suspicion and belief that Mancuso's claim may not be legitimate due to its excessive amount. Unlike the pastor in *Muresan*, Boras stopped short of asserting the factual conclusions necessary

to constitute the elements of theft by deception.  Whereas the pastor asserted that the plaintiffs had their children fake injuries, Boras only expressed his belief that Mancuso's claim *could be* fraudulent.  McLean inferred not that Boras or AMCO were accusing Mancuso of a crime, but that Boras himself, as McLean repeated several times, "had concerns" or believed it "could possibly" be fraudulent.  More cannot be read into the conversation than McLean inferred herself.

Because the facts submitted by Mancuso fail to create any genuine issue of material fact as to whether AMCO's agent accused him of a crime involving moral turpitude, his Fifth Claim for defamation *per se* fails as a matter of law.

## **CONCLUSION**

AMCO is entitled to summary judgment against the Third, Fourth and Fifth Claims for lack of evidence that AMCO committed outrageous conduct or imputed criminal conduct to Mancuso.

DATED this 16th day of January, 2009.

s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge

18 - OPINION